***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon review of the evidence affirms with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between defendant-employer and plaintiff at all relevant times.
3. On 23 October 2001, the date of injury, defendant-employer was self-insured and claims were administered by Gates McDonald.
4. On 23 October 2001, plaintiff's average weekly wage was $753.50, which yields a compensation rate of $502.36.
5. Plaintiff does not work for defendant-employer.
6. A packet of Industrial Commission forms was received into evidence.
 ***********
Based on the foregoing stipulations and the evidence the Full Commission makes the following:
 FINDINGS OF FACT 1. Plaintiff was born on 25 October 1957. She received two associates' degrees, including one in secretarial science. Her work history consists primarily of administrative secretarial work. On 30 December 1996, plaintiff began working for defendant-employer in a facility in New Jersey. While there, she held two positions as a senior records clerk. Her job duties included administrative tasks such as typing calendars, travel vouchers and telephone vouchers and faxing and collating documents. In February 1997, plaintiff was transferred to a different section were she performed secretarial support for twenty-one people. Plaintiff worked ten hours per day and spent approximately six hours per day typing vouchers, calendars, messages, and research summaries.
 2. Plaintiff's records clerk job was eliminated by the company, so she transferred to Charlotte, North Carolina to take a position as a customer service representative for defendant-employer. She was to work in an automated system where customers' calls were interrupted whenever their billing information was not in the computer and automatically routed to the customer service representative for the pertinent billing information to be documented. There was a three-week training period for the position in September 2001. However, after the first several days of training, plaintiff came down with the flu and she missed the remainder of the first week, the second week, and part of the third week. She was only allowed to observe the third and final week of training, although she took intensive notes, which she typed at night. Plaintiff then had to participate in three days of intensive training with an instructor, one on one. During the three days, plaintiff typed eight hours per day as she learned to use the function keys and learned what data she needed to enter into the computer.
 3. On 17 October 2001 while in the intensive training period, plaintiff noticed that her hands were going numb and becoming weak. She subsequently began to answer telephone calls with her trainer present. Plaintiff's hands became increasingly painful even though she was typing four to five hours per day and was not having to type continuously. Her symptoms progressed to the point that on 23 October 2001, she called her manager to report that she could not use her hands. Plaintiff ultimately developed pain from her fingers to her shoulders.
4. During the months after her symptoms developed, plaintiff saw a number of doctors, but the evidence did not disclose their findings and recommendations. Plaintiff also saw Dr. David Baker, who first examined her on 13 March 2002, when plaintiff presented with severe hand and arm pain with numbness and tingling. She reported that she developed symptoms in October 2001 after she began a job as a customer representative. Plaintiff described her pain as severe enough to wake her at night. She experienced difficulties with twisting knobs and faucets, using a can opener and using her mouse with her computer. Plaintiff had tried wearing splints, but found that to be too painful. An examination revealed positive Tinel and Phalen signs for carpal tunnel syndrome. At that time, Dr. Baker diagnosed plaintiff with carpal tunnel syndrome and injected her carpal tunnel area with cortisone. At that point, Dr. Baker did not believe plaintiff could work and took her out of work on 13 March 2002. On 27 March 2002, plaintiff reported that the injection had relieved her pain temporarily, but that the pain returned less severely and was gradually increasing. Dr. Baker recommended surgery via an endoscopic procedure. Dr. Baker performed the endoscopic carpal tunnel releases on 24 April 2002 for the left hand and 27 June 2002 on the right hand.
5. On 25 September 2002, plaintiff complained of severe pain in both hands and wrists. She received cortisone injections. On that date, plaintiff asked Dr. Baker if she should apply for long-term disability. He advised her that he did not believe her condition would result in disability. He excused her from work until 9 October 2002. On 2 October 2002, plaintiff reported that when she returned to work, her hands hurt so badly that she was unable to work. On 9 October 2002, Dr. Baker noted that plaintiff's pain and protectiveness of her hands and arms seemed out of proportion to her diagnosed condition. Dr. Baker recommended a psychological evaluation and stated that he did not believe it was possible for endoscopic carpal tunnel surgery to be unsuccessful. On 20 November 2002, Dr. Baker believed that there was no more he could offer her in terms of treatment. He opined that repetitive motion activities are thought to be contributing factors that can influence the development of carpal tunnel syndrome, but he was not willing to give an opinion on whether plaintiff's job duties contributed to the development of her carpal tunnel syndrome. He also opined that people who do a lot of typing have an increased risk of developing carpal tunnel syndrome as compared to the general public and that typing is a repetitive activity that has the potential to cause carpal tunnel syndrome. He was unable to make any recommendations about her future employment.
6. Plaintiff went to see Dr. Raymond Sweet and reported to him that the bilateral pain in her bicep muscles, arms, hands and fingertips began at work on 17 October 2001 while she was typing. Plaintiff further reported that she had never had a problem before this date and was experiencing bilateral hand pain at night and could not sleep because of it. Dr. Sweet was aware that Dr. Baker had performed endoscopic carpal tunnel releases on both hands and released her. An examination by Dr. Sweet revealed decreased pinch on both hands, decreased pin sensation on the median nerve distribution, and positive Tinel's and Phalen's signs at the wrist. Dr. Sweet ordered nerve conduction studies, which came back normal.
7. Dr. Sweet was of the opinion that people who do repetitive motion work have an increased risk of developing carpal tunnel syndrome as opposed to the general public. He opined that typing is a repetitive motion activity and that a person who types six hours out of a ten-hour day had a greater risk of developing carpal tunnel syndrome than the general public. Dr. Sweet also opined that plaintiff's employment significantly contributed to the development of her carpal tunnel syndrome. He last saw plaintiff on 23 December 2002. Since that date, she has continued to have pain and cramping in her hands, difficulty dressing herself, turning knobs, driving, and performing routine household chores. Dr. Sweet was of the opinion that plaintiff could not return to any job which required repetitive motion of the hands and wrist.
8. Defendants have denied plaintiff's claim for workers' compensation benefits for her carpal tunnel syndrome primarily on the basis that the customer service representative job did not involve constant typing, since there were periods when no customers were on the telephone and when engaged in a call, plaintiff only had to type abbreviated data. However, plaintiff's prior position as a senior records clerk involved sufficient typing to place plaintiff at an increased risk of developing carpal tunnel syndrome as compared to the general public. The typing required during the intensive training period for the new job also significantly increased plaintiff's risk of developing carpal tunnel syndrome.
9. As of 17 October 2001, plaintiff developed bilateral carpal tunnel syndrome. The constant typing required during the training period and the typing required by plaintiff's former position as a senior records clerk were significant contributing factors in the development of carpal tunnel syndrome.
10. Since plaintiff's medical records were not submitted, no medical evidence was provided to address the issue of temporary total disability prior to 13 March 2002, when plaintiff first saw Dr. Baker; nor were her symptoms prior to that date sufficiently documented. As of 13 March 2002, plaintiff was unable to work in any capacity due to her carpal tunnel syndrome and, except for four days when she later attempted to return to work, plaintiff remained disabled. Prior to the hearing before the deputy commissioner, plaintiff had looked extensively for other types of work and had not received any job offers.
11. In that plaintiff has continued to experience debilitating symptoms that Dr. Baker refused to address, it appears that plaintiff should be seen by a doctor qualified to diagnose pain disorders. There is no evidence that plaintiff has reached maximum medical improvement.
12. Plaintiff indicated that she received short-term disability benefits for fifty-two weeks while she was out of work. However, the evidence failed to establish whether the benefits were funded by defendant-employer or plaintiff.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As of 17 October 2001, plaintiff developed bilateral carpal tunnel syndrome, an occupational disease, due to causes and conditions characteristic of and peculiar to her employment that was not an ordinary disease of life to which the general public is equally exposed. N.C. Gen. Stat. § 97-53(13); Booker v. DukeMedical Center, 297 N.C. 458 (1979).
2. Plaintiff had the burden of proving both the existence and the degree of her disability. N.C. Gen. Stat. § 97-29. With the evidence presented, plaintiff failed to prove that she was temporarily totally disabled prior to 13 March 2002. However, she has proven that she was temporarily totally disabled from 13 March 2002, less four days, and continuing thereafter.
3. Plaintiff's average weekly wage was $753.50, which yields a compensation rate of $502.36. Plaintiff's is entitled to receive total disability benefits in the weekly amount of $502.36 from 13 March 2002, less four days, and continuing thereafter until further order of the Industrial Commission. N.C. Gen. Stat. §97-29.
4. Plaintiff is entitled to and defendants shall pay all medical expenses incurred for the treatment of her occupational injuries, including those arising from future treatment by a suitable physician addressing pain disorders so long as such treatments are reasonably required to effect a cure, give relief and/or lessen plaintiff's period of disability. N.C. Gen. Stat. §97-25.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to counsel fees hereinafter approved, defendants shall pay plaintiff temporary total disability benefits in the weekly amount of $502.36 from 13 March 2002, less four days, and continuing thereafter until further order of the Industrial Commission.
 2. Defendants shall pay all medical expenses incurred for the treatment of plaintiff's occupational injuries, including those arising from future treatment by a suitable physician addressing pain disorders so long as such treatments are reasonably required to effect a cure, give relief and/or lessen plaintiff's period of disability.
3. A reasonable attorney fee in the amount of 25% of the compensation approved and awarded for plaintiff is approved and allowed for plaintiff's counsel. The attorney fee shall be deducted from the accrued compensation due plaintiff and paid directly to plaintiff's attorney; thereafter, plaintiff's attorney shall receive every fourth weekly check.
4. Defendants shall pay the costs of this action.
This the ___ day of July 2004.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/__________ THOMAS BOLCH COMMISSIONER